729 F.2d 1229
 34 Fair Empl.Prac.Cas. 881,
34 Empl. Prac. Dec. P 34,306
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,
v.
INLAND MARINE INDUSTRIES, Defendant-Appellant.
Fletcher L. HOUSTON, Plaintiff-Appellee,
v.
INLAND MARINE INDUSTRIES; Rudy Sutton; Douglas Sutton;
Stanley Sutton; and Does I through XXX,
Defendants-Appellants.
 No. 82-4422.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 13, 1984.
Decided April 5, 1984.
 
 Robert W. Tollen, Bronson, Bronson & McKinnon, San Francisco, Cal., for defendants-appellants.
 David Offen-Brown, Chern & Culver, Oakland, Cal., Joan M. Graff and Chris Redburn, Employment Law Center, San Fransico, Cal., for plaintiffs-appellees.
 On Appeal from the United States District Court for the Northern District of California.
 Before DUNIWAY, Senior Circuit Judge, and FARRIS and PREGERSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 INTRODUCTION
 
 1
 Inland Marine Industries (Inland Marine) appeals from a judgment of the United States District Court for the Northern District of California. The district court found that Inland Marine had violated Title VII of the Civil Rights Act of 1964, Sec. 703(a)(1), 42 U.S.C. Sec. 2000e-2(a)(1) (1976), and 42 U.S.C. Sec. 1981 (1976), by paying black employee Fletcher Houston a lower hourly wage than it paid white employees performing the same work. The court awarded Houston $268.85 in backpay, $500 in compensatory damages, $702.17 in court costs, and $7,500 in attorneys' fees.
 
 
 2
 At trial, Houston successfully contended that during the relevant period, Inland Marine never paid any of its 6 black employees more than it paid its 4 white employees. He also convinced the district court that Inland Marine ratified this disparity when its foreman, acting on the directive of the proprietor, failed to raise black workers' pay to parity, even after Houston and another black employee had twice complained about wage discrimination.
 
 
 3
 On appeal, Inland Marine contends that the court made two mistakes.
 
 
 4
 First, the company says that the district court confused disparate treatment with disparate impact analysis,[1] and improperly found for Houston by combining mutually exclusive elements of the two theories. In a disparate treatment case, plaintiff must prove that the employer intended to discriminate. Inland Marine argues that the district court's opinion exonerates company officials of the requisite intent, and that the court's finding of discrimination rests solely on the statistical wage differences--an analysis permissible only on a disparate impact theory. We need not, however, consider the applicability of a disparate impact analysis to these facts, because we may affirm the district court's finding of discrimination on disparate treatment grounds.[2]
 
 
 5
 Second, Inland Marine claims that no matter what the district court found, company officials lacked a discriminatory purpose as a matter of law. In the absence of such intent, Inland Marine argues, the district court may not find the employer guilty of violating Title VII.
 
 
 6
 For the reasons that follow, we reject these arguments and affirm.
 
 FACTS
 A. Hiring at Inland Marine
 
 7
 Inland Marine builds shipping berths and sells them primarily to the Navy. During the spring of 1980, Inland Marine rented a warehouse in Alameda to assemble berths sold under a large order. The sole proprietor put his son Douglas Sutton (Sutton) in charge of the assembling.
 
 
 8
 In March and April, Sutton hired 10 men to help assemble the berths and perform other tasks at the Alameda warehouse.[3] Sutton hired 6 blacks, all referred by the California Employment Development Department (EDD). Without exception, he started them at an hourly wage of $4.50.
 
 
 9
 Sutton also hired 4 white workers: Louis Runnestrand, Daryl Dennis, Paul Skarry, and John Marksman.
 
 
 10
 On March 17, on the recommendation of a carpenter already on the payroll, Sutton hired Runnestrand to perform carpentry work at $5.00 per hour.
 
 
 11
 On March 19, on Runnestrand's recommendation, Sutton hired Dennis to assemble berths at $5.00 per hour. Sutton initially offered $4.50, but Dennis demanded more and Sutton, after talking to Dennis and determining that he was an intelligent person possessing a potential for advancement, offered $5.00. Later, after another employee pointed it out, Sutton observed that Dennis brought his own tools to work and awarded Dennis a raise of indeterminate amount.
 
 
 12
 On March 25, Sutton needed additional manpower for a last-minute task. He hired Skarry to help load a container at $5.00 per hour. Skarry was not a very good worker, so Inland Marine later fired him.
 
 
 13
 Finally, on April 16, Sutton hired Marksman. Before setting Marksman's pay, however, Sutton permitted Marksman to work a 17-hour day. Sutton was so impressed by the work that he gave Marksman $5.00 per hour, and later raised it to $5.50.
 
 
 14
 Sutton hired black referrals from the EDD on April 8 (one man), April 9 (two men), and April 24 (plaintiff-appellee Houston and three other men). He paid every man $4.50 per hour. In no case did he offer more money or provide the black workers with an opportunity to demonstrate their intelligence, purchase their own tools, work longer days, or do other things to earn raises.
 
 
 15
 Houston and another black worker complained to Sutton about the wage disparity. Sutton acknowledged the differences.[4] But instead of ordering pay hikes for all blacks, Sutton awarded 25cents per hour raises only to the two men who complained. Moreover, Sutton simultaneously ordered a 50cents raise for Marksman. When Houston and his companion complained a second time, Sutton paid them the difference between $4.75 and $5.00 per hour--but out of his own pocket, with personal checks. He failed, however, to make up this difference for the other black workers, or to pay any other workers with personal checks.
 
 
 16
 Based on these facts, Houston charged that Inland Marine had used subjective wage-setting criteria to violate both Title VII[5] and Sec. 1981.[6] The EEOC filed a Title VII class action on behalf of Houston and other blacks, and Houston filed an individual action under Sec. 1981. After the EEOC settled the class action with the employer, Houston obtained leave to intervene and pursued his individual claims under both Title VII and Sec. 1981.
 
 
 17
 At trial, Inland Marine contended that Sutton's father, the proprietor, had instructed his son to pay no more than $4.50 per hour, and that the company set this new policy in advance of hiring the EDD referrals. Inland Marine also offered evidence that Sutton had many black friends and acquaintances, and did not treat black people badly.
 
 B. District Court's Findings
 
 18
 In a 4-page opinion, the district court reaffirmed its earlier, oral ruling that Inland Marine had "paid black employees less, in hiring and promotion, than defendant paid other employees for the same work and that such acts were intentional." Houston v. Inland Marine Industries, Civ. No. 81-4729-RPA, slip op. at 1 (N.D.Cal. June 24, 1982) (unpublished opinion and order) (emphasis added). The court reasoned:
 
 
 19
 Based on statistical evidence showing virtually uniform wage disparity and the highly subjective nature o[f] the decisionmaking involved, this Court determined that plaintiff had made out [a] prima facie case for disparate treatment. The burden then shifted to defendant to offer evidence to rebut the inference of intent. Having reconsidered the evidence, it is the finding of this Court that defendant has failed to adduce evidence sufficient to rebut the inference of intent.
 
 
 20
 Id. at 3.
 
 
 21
 But the court qualified its findings. It found "no culpability on the part of Douglas Sutton, the foreman who was primarily responsible for determining wages, and no scheme or plan on the part of the company to discriminate." Id. at 1 (emphasis added); see also id. at 2 (using similar language). The court added:
 
 
 22
 Despite the fact that the evidence exonerates foreman Douglas Sutton and dispels plaintiff's contention that the company acted with malice, the company intended to discriminate against its black employees within the meaning of Lynn [v. Regents of the University of California, 656 F.2d 1337, 1343 n. 5 (9th Cir.1981) (discussing subtle discrimination), cert. denied, --- U.S. ----, 103 S.Ct. 53, [74 L.Ed.2d 59 (1982) ]. The company did not consciously set out to establish a two-tiered wage structure, and hence did not act maliciously; however, it cannot escape responsibility for the maintenance of that structure....
 
 
 23
 Houston v. Inland Marine Industries, Civ. No. 81-4729-RPA, slip op. at 3 (N.D.Cal. June 24, 1982) (unpublished opinion and order). Still, the district court pointed to the wage disparity and noted that despite "ample opportunity to adjust and correct" the problem, Inland Marine had "acquiesced therein and chose to maintain it." Id. The court did not state that Sutton's father, the proprietor, was free from culpability.
 
 
 24
 The district court entered judgment for Houston in the amount of $768.85 plus costs and attorneys' fees, and Inland Marine appealed.
 
 STANDARD OF REVIEW
 
 25
 The principal question on review is whether Inland Marine, in setting wages, intended to discriminate against Houston and other blacks. The district court found that Inland Marine so intended. We may reverse this finding only if we conclude that it is clearly erroneous under Fed.R.Civ.P. 52(a). Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 290, 102 S.Ct. 1781, 1791, 72 L.Ed.2d 66 (1982); accord Wall v. National R.R. Passenger Corp., 718 F.2d 906, 909 (9th Cir.1983); Piva v. Xerox Corp., 654 F.2d 591, 594 (9th Cir.1981); Golden v. Local 55, International Association of Firefighters, 633 F.2d 817, 820 (9th Cir.1980).
 
 ANALYSIS
 A. District Court's Approach
 
 26
 1. Definitions. The Supreme Court recognizes two theories under which plaintiffs may establish Title VII liability: disparate treatment[7] and disparate impact. Disparate treatment
 
 
 27
 is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.
 
 
 28
 International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977) (citations omitted) (emphasis added); see also B. Schlei & P. Grossman, Employment Discrimination Law 13 (2d ed. 1983) ("The essence of disparate treatment is different treatment: that blacks are treated differently than whites, women differently than men. It does not matter whether the treatment is better or worse, only that it is different.").
 
 On the other hand, disparate impact claims
 
 29
 involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.... Proof of discriminatory motive, we have held, is not required under a disparate impact theory.
 
 
 30
 Teamsters, 431 U.S. at 336 n. 15, 97 S.Ct. at 1855 n. 15, (emphasis added); see Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853-54, 28 L.Ed.2d 158 (1971) ("The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation.").
 
 
 31
 The gravamen of Houston's complaint is that Inland Marine, relying on subjective wage-setting criteria, treated black employees differently from the way it treated white employees. Therefore, the district court properly analyzed this as a discriminatory treatment case. See, e.g., Heagney v. University of Washington, 642 F.2d 1157, 1163 (9th Cir.1981).[8]
 
 
 32
 2. Allocation of proof. In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), reaffirmed in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) [hereinafter the McDonnell Douglas/Burdine formula], the Supreme Court set out the three-leg course that a Title VII plaintiff must successfully navigate to establish liability.
 
 
 33
 First, plaintiff has the burden of proving by a preponderance of the evidence a prima facie case of racial discrimination. Second, if plaintiff succeeds in establishing a prima facie case, the burden of producing evidence shifts to defendant "to articulate some legitimate, nondiscriminatory reason" for the disparate treatment. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824. Finally, if defendant carries his burden, plaintiff must then have an opportunity to prove by a preponderance of the evidence that the employer's reasons were merely a pretext for discrimination. Burdine, 450 U.S. at 252-53, 255-56, 101 S.Ct. at 1094-95; McDonnell Douglas, 411 U.S. at 802-04, 93 S.Ct. at 1824-25; see EEOC v. Crown Zellerbach Corp., 720 F.2d 1008, 1011-12 (9th Cir.1983).
 
 
 34
 Of course, even though the McDonnell Douglas/Burdine formula shifts the burden of producing evidence, it never relieves plaintiff of his ultimate burden of proving discriminatory intent by a preponderance of the evidence. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093 (citation omitted).
 
 
 35
 3. What the district court did. Relying on United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), Inland Marine argues that the district court conducted an improper analysis for two reasons. First, the court framed its opinion in terms of finding a prima facie case, rather than in terms of finding the ultimate fact of discriminatory intent.
 
 
 36
 Second, pointing to various passages in the court's opinion and order, see supra p. 6 (quoting opinion and order), Inland Marine adds that the court undercut its own disparate treatment analysis by "exonerat[ing]" foreman Sutton and the company of discriminatory intent, while purporting nonetheless to find such intent in Sutton's refusal to bring the wages of Houston and other blacks in line with those of whites. The company contends, in essence, that the only way the court could have found the requisite intent on which to ground Title VII liability against Inland Marine was somehow to extract this intent from either the prima facie case alone, or from the disparate impact of wage decisions on blacks. The company reasons that the McDonnell Douglas/Burdine formula does not permit either approach in a disparate treatment case.
 
 
 37
 Inland Marine is wrong on both counts. The district court simply conducted the three-stage analysis that the McDonnell Douglas/Burdine formula requires. See supra p. 6 (quoting opinion and order). First, the court found that Houston's statistical evidence--showing that during the period in question, no black ever earned more than any white--established a prima facie case. Second, the court noted that the burden of production shifted to Inland Marine to articulate a legitimate nondiscriminatory reason for the disparate treatment. The court concluded that Inland Marine failed to produce evidence "sufficient to rebut the inference of intent." Houston v. Inland Marine Industries, Civ. No. 81-4729-RPA, slip op. at 3 (N.D.Cal. June 24, 1982) (unpublished opinion and order). This finding properly concluded the inquiry and made it unnecessary for the court to proceed to the third stage of the formula. Instead, the court ruled that Houston had proved that Inland Marine violated the statute, because
 
 
 38
 [t]he disparate wage structure developed over time, but defendant had been duly informed of this obvious disparity. Defendant had ample opportunity to adjust and correct the disparity, yet defendant acquiesced therein and chose to maintain it. It is the opinion of this Court that defendant was primarily motivated by subtle, but nevertheless discriminatory attitudes, and thus is liable to plaintiff under Title VII and section 1981.
 
 
 39
 Id. at 3.
 
 
 40
 This analysis did not, as Inland Marine contends, confuse disparate treatment with disparate impact. It is nothing more than a straightforward application of the McDonnell Douglas/Burdine formula.
 
 
 41
 Aikens, therefore, is inapposite. There the Supreme Court criticized the court of appeals for discussing at length whether plaintiff had made out a prima facie case when the real question, on appeal from a full trial on all the evidence, was whether plaintiff had proved discriminatory intent. Aikens, 103 S.Ct. at 1481 ("Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a prima facie case. We think ... they have unnecessarily evaded the ultimate question of discrimination vel non." (footnote omitted)).
 
 
 42
 In the case before us, the district court did address this ultimate question. To the extent the district court spoke of finding a prima facie case, it did so because this Circuit requires district courts to provide such specific findings in Title VII cases. See, e.g., Peters v. Lieuallen, 693 F.2d 966, 969 (9th Cir.1982).
 
 B. District Court's Findings of Intent
 
 43
 The district court repeatedly says that it found Inland Marine guilty of intentional discrimination. E.g., Houston v. Inland Marine Industries, Civ. No. 81-4729, slip op. at 1, line 23 (N.D.Cal. June 24, 1982) (unpublished opinion and order); id. at 3, lines 14, 17, 27, 28-30. The court thought that this discrimination was "subtle," id. at 3, line 28, but intentional nonetheless.
 
 
 44
 Yet Inland Marine asserts that the district court "exonerate[d]" foreman Sutton from all intentional wrongdoing. Inland Marine, however, misreads the court's opinion. Far from declining to find intentional discrimination, the court ruled that Inland Marine had discriminated without "malice." Id. at 3, line 17. The court's finding that this discrimination manifested itself subtly, rather than through the "culpability" of the foreman, id. at 1, line 27; id. at 2, line 7, or though a "scheme or plan," id. at 1, line 29; id. at 2, line 7, does not diminish the fact that the court did find intentional discrimination. See Taylor v. Teletype Corp., 648 F.2d 1129, 1133 n. 7 (8th Cir.), cert. denied, 454 U.S. 969, 102 S.Ct. 515, 70 L.Ed.2d 386 (1981).[9]
 
 
 45
 The requisite intent lay in Douglas Sutton's two-time refusal, at his father's behest, to bring the blacks' hourly wages in line with those of whites. When Houston and a co-worker first complained, Sutton raised their wages 25cents per hour--still 25cents short of the wages he paid white workers. Later, when the two black men complained again, Sutton paid them out of his own pocket, but simultaneously raised at least one other white worker 50cents. And in any event, when Sutton did act, he confined his actions to satisfying only the men who complained. At no time did he or his father attempt to institute across-the-board changes to correct a systemic inequity in wages.
 
 
 46
 By refusing to change his subjective wage-setting policies or to bring black wages in line with those of whites, Sutton ratified the existing disparities. His ratification constituted all the intent the court needed to find Inland Marine guilty on a disparate treatment theory. See Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 997 (5th Cir.1969) (per Wisdom, J.) ("The requisite intent [to discriminate] may be inferred from the fact that the defendants persisted in the conduct after its racial implications had become known to them."), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); McNeil v. McDonough, 515 F.Supp. 113, 129 (D.N.J.1980) (under an ancient rule, courts consider conduct invading others' rights, though innocent when undertaken, as intentional if the actor fails to correct the problem after someone has pointed it out to him (citation omitted)), aff'd per curiam, 648 F.2d 178 (3d Cir.1981).[10]
 
 
 47
 In today's world, racial discrimination sometimes wears a benign mask. See Lynn v. Regents of the University of California, 656 F.2d 1337, 1343 n. 5 (9th Cir.1981), cert. denied, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982). Current practices, though harmless in appearance, may hide subconscious attitudes, McNeil v. McDonough, 515 F.Supp. at 129, and perpetuate the effects of past discriminatory practices, Schnapper, Perpetuation of Past Discrimination, 96 Harv.L.Rev. 828, 834, 838 (1983). Although subjective employment criteria are not illegal per se, e.g., Heagney v. University of Washington, 642 F.2d 1157, 1163 (9th Cir.1981); Ward v. Westland Plastics, Inc., 651 F.2d 1266, 1270 (9th Cir.1980) (per curiam), courts should examine such criteria very carefully to make certain that they are not vehicles for silent discrimination, e.g., O'Brien v. Sky Chefs, Inc., 670 F.2d 864, 867 (9th Cir.1982) (citation omitted).
 
 
 48
 The district court carefully analyzed Inland Marine's subjective wage-setting practices and found intentional discrimination. This finding was not clearly erroneous. Therefore, we AFFIRM the judgment in all respects.
 
 
 
 [1]
 Under a disparate treatment theory, plaintiff must prove that the employer intended to treat him differently from the way it treated other employees performing the same work. Under a disparate impact theory, plaintiff must merely prove that the employer's use of a purportedly neutral employment practice had the effect of harming plaintiff. Intent need not be proven. See infra pp. 1233-1234; International Bhd. of Teamsters v. United States, 431 U.S. 324, 335-36 n. 15, 97 S.Ct. 1843, 1854, 52 L.Ed.2d 396 (1977)
 
 
 [2]
 In his brief, Houston argues that we may affirm on a disparate impact theory. But Houston has pursued the case all along as a disparate treatment claim. Moreover, the district court placed its findings in a disparate treatment framework. Therefore, we think the case is best analyzed as a disparate treatment claim
 
 
 [3]
 Inland Marine rehired or reassigned 10 additional employees from its other operations to the Alameda plant. Although Houston alleges that among these individuals, the lowest-paid were uniformly minorities, these other 10 workers are not the focus of his complaint
 
 
 [4]
 Douglas Sutton testified as follows:
 Q. Okay. He [Houston] said it had come to his attention that the black people were getting more than the white people?
 A. Right. The other way around. The black people were getting less than the white people.
 Q. Right. What did you say, go on with the conversation.
 A. I had to stop and think about it for a minute and I realized that had never come into me.
 I mean, that was [a] pretty heavy accusation right there and I was kind of "Wait a minute," and I said, I thought about it and I said, "That's right, that's true." And he brought out a couple of people--and brought up a couple of people and he said why is this guy making this kind of money?
 And I said, well, he is working longer than you and he said, "How about this guy Marksman?" And I said, "Well, I think Marksman is a pretty good worker."
 And he said, "Well, I am a pretty good worker." And I always thought Mr. Houston was a satisfactory worker, but I didn't think he was anything like this other guy. And, he says, "Well, you are trying to tell me he is worth $5.50 and I am only worth $4.50?"
 ....
 Q. In [ ] answer[ ] to his statements that the whites were making more than the blacks, what did you say?
 A. I said that's true.
 Record at 312-14.
 
 
 [5]
 Title VII, in relevant part, makes it an unlawful employment practice for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin ...." 42 U.S.C. Sec. 2000e-2(a)(1) (1976)
 
 
 [6]
 Section 1981 gives "[a]ll persons" the same right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens...." 42 U.S.C. Sec. 1981 (1976)
 
 
 [7]
 A plaintiff must meet the same standards in proving a Sec. 1981 claim that he must meet in establishing a disparate treatment claim under Title VII; that is, he must show discriminatory intent. See General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). Therefore, our discussion of Houston's Title VII claim also applies to his Sec. 1981 claim
 
 
 [8]
 See supra note 2
 
 
 [9]
 In Taylor, the Eighth Circuit recognized that some confusion could result from the district court's decision to award a Title VII judgment to plaintiff despite the lower court's finding that "[t]here is no showing that the disparate impact of layoffs and demotions in 1975 was the result of a conscious effort to harm blacks as such." Taylor v. Teletype Corp., 648 F.2d at 1133 n. 7 (citation omitted)
 Viewing the record as a whole, however, the Eighth Circuit concluded:
 [W]e believe that the court merely expressed its belief that no direct evidence of conscious or malicious racial animus had been presented. The court found, and we agree, that sufficient evidence existed to allow the court to make the necessary inference of discriminatory racial motivation.
 Id.
 
 
 [10]
 See also Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002, 1007 (9th Cir.1972) (Employer's continued reliance on state labor code provision, which had been struck down because it discriminated on the basis of sex, "could no longer be considered to be in good faith."); cf. Albemarle Paper Co. v. Moody, 422 U.S. 405, 422, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) ("Where an employer [has] shown bad faith--by maintaining a practice which he knew to be illegal or of highly questionable legality--he can make no claims whatsoever on the Chancellor's conscience."); Shah v. Mt. Zion Hospital & Medical Center, 642 F.2d 268, 271 (9th Cir.1981) (Plaintiff "did not demonstrate that Mt. Zion knew of and failed to remedy any training deficiencies.")